IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>ONEIL WAYNE SOUTH<br><br>    Defendant. | Case No.:  1:19-CR-43<br>(JUDGE KLEEH) |

## REPORT AND RECOMMENDATION RECOMMENDING DEFENDANT'S MOTION TO SUPPRESS BE DENIED

   This matter comes before the undersigned pursuant to a referral order (ECF No. 33) entered by Honorable United States District Judge Thomas S. Kleeh on November 19, 2019, referring Defendant's Motion to Suppress (ECF No. 30) and Amended Motion to Suppress (ECF No. 32) to the undersigned for a hearing and Report and Recommendation. Defendant, by Counsel, filed the aforementioned Motions to Suppress on November 18 and November 19, 2019, respectively.[1] The Government filed a Response in Opposition to Defendant's Motion on December 9, 2019 (ECF No. 34).

   A Motion Hearing was held before the undersigned on Monday, December 16, 2019, at which the Defendant appeared in person and by Counsel, Assistant Federal Public Defenders Hilary Godwin and Katy Cimino and the Government by Counsel, Assistant United States Attorneys Danae DeMasi-Lemon and Andrew Cogar. The witness testimony of Officer Reed Moran from the

---

[1] Both motions are identical with regard to the facts presented and the Defendant's substantive arguments. The only difference in the Motions is the Amended Motion (ECF No. 32) has Officer Reed Moran's police report and narrative from the incident in question attached as Exhibit 1. As such, the Amended Motion to Suppress (ECF No. 32) will be considered the operative motion for the purpose of this Report and Recommendation.

1

Fairmont Police Department was taken. Accordingly, this matter is now ripe for a Report and Recommendation to United States District Judge Thomas S. Kleeh.

This Report and Recommendation examines the following issues: (1) Whether Officer Moran had the requisite reasonable articulable suspicion of criminal activity to conduct an investigatory stop of the Defendant, Oneil South; and (2) Whether under the totality of the circumstances, Officer Moran had the requisite reasonable articulable suspicion that the Defendant, Oneil South was armed and dangerous to justify a pat down for officer safety. Answering the issues presented in the affirmative for the reasons stated herein, the undersigned **RECOMMENDS** Defendant's Motions to Suppress (ECF No. 30 and 32) be **DENIED**.

## I.  BACKGROUND AND PROCEDURAL HISTORY

On March 8, 2019, at approximately 3:26 A.M., Fairmont Police Department Officer Reed Moran was dispatched "to a suspicious vehicle call at 1369 Locust Ave."[2] (ECF No. 32-1 at 6). Dispatch advised Officer Moran "that there were 2 vehicles in the friendly motor parking lot, a dark convertible and a red sedan, and that there were multiple subjects getting in and out of the vehicle and that the caller could see lighters igniting in the dark." Id. While en route, dispatch advised Officer Moran "the dark convertible had left south bound on Locust Ave and that the occupants of the red vehicle had gone inside of an apartment." Id. Officer Moran first "searched for the dark convertible but was unable to locate it." Id.

Officer Moran then returned to "1369 Locust Ave and located a red Chevy Cruze" that was "parked in front of the building." Id. Officer Moran observed that the "vehicle was running with the passenger window rolled down." Id. Officer Moran was "able to hear music softly playing in the vehicle. No one was in or around the vehicle." Id. Officer Moran proceeded to drive "up onto Walton Ave to observe the vehicle." Id. While observing, Officer Moran "saw a male approach the vehicle,

---

[2] All facts contained herein regarding the incident in question are taken exclusively from Officer Moran's narrative in his police report attached to Defendant's Amended Motion to Suppress as Exhibit 1. (ECF No. 32-1 at 6-7).

enter it, and then go back to the apartments." Id. Officer Moran "checked the vehicle again and found it to still be running." Id.

At approximately 3:45 A.M., Officer Moran "departed the area" but remained "nearby." Id. At approximately 4:03 A.M., "dispatch advised that the same caller was back on the phone saying that there was a male and a female in the vehicle and that they were playing loud music." Id. Officer Moran responded with fellow Officer Buck. Id. As Officer Moran pulled "into the lot", he observed a "black male walking away from the vehicle." Id. Officer Moran "exited and told the male to stop" but the male "continued to walk away" and "Officer Buck ordered the male to stop and he complied." Id.

Officer Moran "approached the male and immediately recognized him to be Oneil South." Id. Mr. South "denied having been playing loud music." Id. Officer Moran asked "South if he had anything on his person" Officer Moran "should be aware of" and Mr. South "said no." Id. Officer Moran advised Mr. South that he "was going to conduct a pat down and he was compliant." Id. While conducting the pat down, Officer Moran "observed Buck to reach under South's shirt and remove a pistol from a shoulder holster." Id. Officer Moran continued the pat down and "felt a long cylindrical object in South's left front pocket." Id. Officer Moran asked Mr. South "what was in the pocket and he stated that he did not know." Id. Based upon his training and experience, Officer Moran "believed this item to be drug Paraphernalia and removed it." Id.

The item was a "small piece of metal tubing with a piece of copper scrubbing pad placed inside one end." Id. at 7. Officer Moran recognized the item to "be a homemade drug pipe from experience" and he "asked South what kind of drugs he used." Id. Mr. South "admitted that he occasionally smoked Crack Cocaine." Id. Officer Moran then began to "remove all of the items from South's pocket and located a small plastic bag with what appeared to be 2 Crack rocks inside." Id.

Based upon Mr. South possessing a "crack smoking pipe, crack, and admitting to using crack", Officer Moran "believed him to be a user of Crack Cocaine and as such prohibited from

3

owning a firearm." Id. Officer Moran further knew "from experience that South is often involved in drug use." Id. Officer Moran "advised South that he was under arrest for carrying a firearm concealed while being a prohibited person." Id. Officer Moran then transported Mr. South and all evidence to the Fairmont Police station.

While at the police station, Officer Moran "conducted a second search of South and in his left front pocket found a small blue ziplock baggie." Id. Inside of the baggie, Officer Moran located "several other small baggies one of which appeared to contain a white powder consistent with Cocaine." Id. Further, Officer Moran located in Mr. South's waistband, a "brown leather holster used for carrying a handgun in a concealed manor." Id.

Upon further examination "for the blue baggie", Officer Moran "found that it contained 1 yellow baggie with apparent powder Cocaine, 2 empty baggies" and two "small foil packets." Id. Within the foil packets, Officer Moran "found more apparent Crack Cocaine." Id. All the suspected illegal substances were "filed tested" and yielded positive results for Cocaine. The total "approximate weight of the drugs was less than 1 gram." Id. The "pistol was a black Taurus Millennium G2 9mm pistol SN TJZ86948. Loaded in the magazine were 5 9mm cartridges." Id.

On July 9, 2019, the Grand Jury for the United States District Court for the Northern District of West Virginia returned a two count Indictment against Defendant Oneil Wayne South charging him with one count of Unlawful Possession of a Firearm as a Drug User in violation of Title 18, United States Code, Sections 922(g)(3) and 924(a)(2) in connection with the events recounted herein. (ECF No. 1). Defendant was further charged with one count of Reckless Flight from a Law Enforcement Officer in violation of Title 18, United States Code, Sections 13(a) and 7(3), and West Virginia Code, Chapter 61, Article 5, Section 17(f) in connection with separate events unrelated to Count One of the Indictment and the subject of Defendant's Motion to Suppress. (ECF No. 1).

Defendant, Mr. South had his initial appearance on the Indictment before United States Magistrate Judge Robert W. Trumble on July 11, 2019. (ECF No. 8). Defendant had his arraignment

4

before Judge Trumble on July 15, 2019. Defendant, by Counsel Assistant Federal Public Defender Hilary Godwin, filed a Motion to Suppress on November 18, 2019 (ECF No. 30) and an Amended Motion to Suppress on November 19, 2019. (ECF No. 32). The Government filed a Response in Opposition on December 9, 2019. (ECF No. 34). A Motion Hearing was held before the undersigned on Monday, December 16, 2019 (ECF No. 36). The testimony from the Motion Hearing is summarized below.

## II.   SUMMARY OF TESTIMONY

The first and only witness called by either party at the Motion Hearing held on December 16, 2019, was Officer Reed Moran of the Fairmont Police Department. Officer Moran works for the City of Fairmont as a patrolman for the Fairmont City Police Department. Officer Moran has worked for the City of Fairmont for about five and a half years. (Audio Recording of Motion Hearing held on December 16, 2019, in Clarksburg Magistrate Judge Courtroom FTR Gold, at 10:00:27 – 38)[3].

Officer Moran testified that on March 8, 2019, he was on duty working the midnight shift. (10:01:17- 35). On this night, Officer Moran received a call for suspicious activity and was dispatched to the "area of 1367-1369 Locust Avenue" where two apartments "sit right side by side." (10:01:35 – 49). The call for suspicious activity was originally a call for a "suspicious vehicle slash suspicious persons complaint." (10:01:50 – 55). Dispatch advised Officer Moran that the caller had seen two vehicles in the "old Friendly Motors parking lot" which was at the time "a closed car lot." (10:01:55 – 10:02:04). The caller could further describe both vehicles as being one "dark colored convertible and a red four door sedan." (10:02:05 – 10). The caller advised they could "see lighters in the dark on the inside of the cab of the cars and people getting in and out of the cars." (10:02:10 – 21).

---

[3] All time references contained herein refer to the audio recording of the motion hearing held in the Clarksburg Magistrate Judge Courtroom on Monday, December 16, 2019, found in FTR Gold.

Officer Moran described the area of Locust Avenue as a "residential kind of area" with "lower end apartments." (10:02:25 – 45). Officer Moran testified in particular that the "1367 and 1369 Locust" apartments are the location of frequent law enforcement calls for "domestics, both verbal and physical" and "drug complaints." Officer Moran testified that "stabbings" have occurred at these locations as well as "parties" and described the area as a "high call volume area" that tends to have "a lot of drug activity and some more violent crime." (10:02:45 – 10:03:19). Officer Moran testified that he has responded to calls there in the past.

Upon receiving the call from dispatch on the night of March 8, 2019, Officer Moran testified that he "thought it very likely that two people or two groups of people had met up to exchange drugs and were probably smoking them in the vehicles outside of the apartments." (10:03:50 – 10:04:07). Officer Moran testified his belief of likely drug activity was based upon "time and location" as well as "seeing lighters flick on and off" because with "drug pipes" and the use of drugs among multiple people, "you would see lighters frequently going on and off" as the drugs are passed around. (10:04:08 – 45).

After receiving the call, Officer Moran testified that he left the station and travelled to the area to investigate. While in route to the area, dispatch advised Officer Moran that "the caller was now stating that the dark convertible had left and was travelling southbound on Locust Avenue." (10:04:45 – 10:05:17). Officer Moran testified that when he arrived in the area of Locust Avenue, he could see that the red vehicle was still in the parking lot of the apartments. Officer Moran noticed that the "green car", previously described as the "dark convertible" was not visible and attempted to locate it. (10:05:29 – 58). After failing to locate the "green car", Officer Moran returned to the apartments at Locust Avenue to investigate the "red car", previously described as a "red four door sedan". When he arrived, Officer Moran testified that the vehicle was "unoccupied", it was "running", a window was rolled down, he could "hear music playing softly from inside the vehicle" and there was nobody present in or around the vehicle at the time. (10:06:05 – 27).

At this time, Officer Moran testified that he drove "up the hill" and parked on "Walton Avenue" where he could see down to the parking lot to see if he could observe the same activity the caller had previously reported. (10:06:28 – 42). While observing the area, Officer Moran testified that he noticed a "male exit the front of the apartment building, go to the vehicle on the passenger side, hang out for just a minute, and then return back to the apartment building." (10:06:43 – 55). Officer Moran testified that, after observing the area of Locust Avenue for approximately twenty minutes and seeing no further activity, he left the "immediate area" but remained in the "general area." (10:06:57 – 10:07:16).

Officer Moran testified that he was later advised by dispatch of a second call in which the caller "was back on the line and now stating that" there was now a "male and female" in the "red car" and they were "playing loud music." (10:07:17 – 35). Officer Moran testified that the second call occurred approximately thirty minutes after his initial surveillance of the area which was around "4:00 A.M. – 5:00 A.M." (10:07:36 – 47). After the second call came in, Officer Moran testified that he was talking to another officer and they both responded "to address the noise complaint." The other officer mentioned by Officer Moran was Officer Zachary Buck of the Fairmont Police Department. (10:07:50 – 10:08:00). Officer Moran testified he again believed there could be "possible drug activity." (10:08:00 – 11).

Officer Moran testified that both calls were from the "same caller" and the caller provided that their address was "1369 Locust Avenue." Officer Moran testified that he believed the caller "was observing events happening in real time." (10:08:14 – 36). Officer Moran further testified that that because the caller was a "known caller", was accurately reporting what they were seeing to the dispatcher, and Officer Moran had "corroborated" what the caller was describing, he did not believe it was a false report. (10:08:39 – 10:09:22).

Upon responding the second call, Officer Moran observed "a male walking away from the vehicle on a similar line that" he had "earlier seen a male approach the vehicle and then leave on."

Officer Moran testified he believed it was "very likely" this was the same male he had observed previously. (10:10:01 – 16). Officer Moran testified it was the same red sedan he had observed earlier when responding to the first call. Officer Moran testified that he exited his vehicle and addressed the male walking away by asking him to "stop." Officer Moran testified that the male refused and continued walking. Officer Moran testified that Officer Buck then "yelled at the male to stop" and he complied. (10:10:30 – 45).

Officer Moran testified that, as he approached the male and was "close enough," he "immediately recognized the male as someone" he had "dealt with previously, Oneil South." (10:10:46 – 10:11:04). Officer Moran testified that he knows Mr. South because he is a "known person to the agency" who has been the subject of several calls and arrests. Officer Moran testified he has arrested Mr. South in the past. Officer Moran testified that Mr. South is known to be involved with "drugs, firearms, and domestics." (10:11:30 – 53). Officer Moran further testified that he knows other officers who have arrested Mr. South as well and that Mr. South has been previously arrested on both "firearm warrants" and "other drug cases." (10:12:26 – 41).

Regarding Officer Moran's prior arrest of Mr. South, Officer Moran testified that around "2016 or 2017" he was dispatched to a "verbal domestic" and upon checking identifications, the "male involved came back with a warrant." While at the police station, officers discovered that "the warrant was for Oneil South, Sr." (the subject of the case at hand) but they had arrested "Oneil South, Jr." (10:12:42 – 10:13:36). The officers later developed information on the location of Oneil South, Sr. and served the active arrest warrant on Mr. South. Incident to the arrest, officers observed "drug paraphernalia, suspected drugs, and ammunition." After obtaining a search warrant for Mr. South's motel room, officers later found "firearms, firearm parts, ammunition, and several different types of firearms" all in the room "controlled by Mr. South." (10:13:39 – 10:14:23).

As a result of this prior contact with Mr. South, at the time Officer Moran recognized Mr. South on March 8, 2019, Officer Moran asked Mr. South if he "had anything on his person" he

8

"should be aware of." Officer Moran then advised Mr. South he would conduct a "pat down" for officer safety. (10:14:34 – 54). Officer Moran testified that Mr. South was "compliant." Officer Moran testified Mr. South was wearing "jeans, a t-shirt, and a dark colored, medium weight jacket." (10:14:55 – 10:15:12). While Officer Moran conducted the pat down, Officer Buck told Mr. South not to move, and Officer Moran watched Officer Buck reach "under Mr. South's shirt or jacket on the left side up in the ribs and remove a handgun from a shoulder holster." (10:15:30 – 10:16:10).

Mr. South was then detained in handcuffs due to discovery of the firearm and Officer Moran continued the pat down. Officer Moran felt a "long, cylindrical object" in Mr. South's front pockets that Officer Moran believed was consistent with a pipe used for drug use. Officer Moran asked Mr. South if he was "smoking crack" and Mr. South advised "occasionally." (10:16:15 – 10:17:00). Officer Moran then removed the object from Mr. South's pocket. Officer Moran further located a "baggie" of what appeared to be "crack rocks" in Mr. South's pockets. (10:17:30 – 56). Officer Moran then concluded that Mr. South was an admitted user of "crack-cocaine", in possession of "crack-cocaine" and, as such, prohibited from possessing a firearm under West Virginia law. (10:17:57 – 10:18:17).

Officer Moran then informed Mr. South that he was under arrest and transported Mr. South to the Fairmont police station. At the station, Officer Moran conducted a further search incident to arrest where he located a "smaller baggie" that appeared to contain "powder cocaine" along with aluminum foil that "appeared to be drug paraphernalia." The suspected "crack rocks" and the "powder cocaine" were both field tested at the station and the test confirmed the presence of cocaine. (10:18:19 – 10:19:22).

Counsel for the Defendant, Assistant Federal Public Defender Hilary Godwin, then conducted cross-examination of Officer Moran. (10:19:40). Officer Moran testified he corroborated from the caller that a red sedan was present in the area of 1369 Locust Avenue. Officer Moran testified he observed a man come from the front of the apartment building, go to the red sedan for a

minute, and then leave. (10:23:30 – 10:24:16). Officer Moran testified that, based on the call, he believed he was permitted to require the Defendant to stop to investigate the complaints of a noise violation (10:24:55 – 10:25:30). Officer Moran testified that the Defendant, Mr. South, is "attached to 17 different reports" with the Fairmont Police Department. (10:26:10 – 58). Regarding the nature of Locust Avenue, Officer Moran testified that he "would be surprised" if a week went by where officers did not receive a call to respond to Locust Ave. for potential criminal activity. However, he could not recall how many times he had responded to the area in the immediate days and week prior to March 8, 2019. (10:28:30 – 10:29:40).

### III.   CONTENTIONS OF THE PARTIES

A. **Defendant's Motion to Suppress**

Defendant, by Counsel, filed a Motion to Suppress (ECF No. 30) and an Amended Motion to Suppress (ECF No. 32). Both motions are identical with regard to the facts presented and the Defendant's substantive arguments. The only difference in the Motions is the Amended Motion (ECF No. 32) has Officer Reed Moran's police report and narrative from the incident in question attached as Exhibit 1. As such, the Amended Motion to Suppress (ECF No. 32) will be considered the operative motion for the purpose of this Report and Recommendation.

In Defendant's Amended Motion to Suppress (ECF No. 32), Defendant argues that Officers Moran and Buck "lacked reasonable suspicion to conduct an investigatory stop of Mr. South on March 8, 2019. (ECF No. 32 at 1). Defendant argues that Officers Moran and Buck did not have the requisite reasonable articulable suspicion that criminal activity was afoot at the time they ordered the Defendant to stop. (ECF No. 32 at 6). Defendant contends that the only facts known to the officers at the time "were that (1) there was a noise complaint and (2) vehicles were parked in a former used car lot/parking next to an apartment building." Id. As such, Defendant argues these facts are insufficient to establish reasonable suspicion of criminal activity and, therefore, Officer Moran and Buck's

investigatory stop of Mr. South violated his Fourth Amendment rights. Accordingly, Defendant requests all evidence obtained during the stop be suppressed.

### B. Government's Response in Opposition

The Government responds to Defendant's Motion to Suppress and contends that Officer Moran and Buck did have reasonable, articulable suspicion "to effectuate an investigative stop of the defendant." (ECF No. 34 at 4-5). The Government contends Officers Moran and Buck's reasonable, articulable suspicion justifying the investigative stop consisted of the following facts:

> (1) they received a non-anonymous call describing behavior indicative of drug activity around vehicles in a parking lot in the middle of the night and observed the defendant walking away from one of those vehicles; (2) the location of the call was a place for known drug activity and domestic disputes; and (3) the officers knew the defendant's violent criminal history regarding domestic disputes, and possession of drugs and firearms.

Id. at 5. Accordingly, the Government requests the Defendant's Motion to Suppress be denied.

### IV.   LEGAL ANALYSIS

**A. Officers Moran and Buck had reasonable, articulable suspicion to conduct an investigatory stop of the Defendant under *Terry*.**

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An officer may, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, at 30 (1968)).

The United States Supreme Court has held that while reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Wardlow, 528 U.S at 123 (citing United States v. Sokolow, 490

11

U.S. 1, 7 (1989)). As such, the "officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity.'" Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27). In evaluating whether an officer possessed the requisite reasonable, articulable suspicion sufficient to justify an investigative stop under Terry, the Court looks to the "totality of the circumstances – the whole picture." Sokolow, 490 U.S. at 8 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). The United States Supreme Court in Cortez stated the following as to the totality of the circumstances test: "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same – and so are law enforcement officers." Cortez, 449 U.S. at 418.

The United States Court of Appeals for the Fourth Circuit has consistently held that both presence in a high-crime area and "the late hour of a police encounter can contribute to a finding of reasonable suspicion" for an investigatory stop. United States v. Foster, 824 F.3d 84, 92 (4th Cir. 2016) (citing United States v. Slocumb, 804 F.3d 677, at 682 (4th Cir. 2015)). Further, an individual's tip to police may supply part of the basis for reasonable suspicion. The "basic rules governing informant's tips are well-established. In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure that the tip possesses sufficient indicia of reliability." United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004) (citing Florida v. J.L., 529 U.S. 266, 270 (2000); Alabama v. White, 496 U.S. 325, 326-27 (1990); Adams v. Williams, 407 U.S. 143, 147 (1972)). "A known informant's tip is generally more reliable than that of an unknown informant because the informant 'can be held responsible if her allegations turn out to be fabricated.'" United States v. Washington, 346 Fed.Appx. 950, 952 (4th Cir. 2009) (quoting Florida v. J.L., 529 U.S. 266, 270 (2000)).

Here, Officer Moran responded to two separate calls from the same known caller with dispatch advising as to suspicious activity occurring at 1369 Locust Avenue in Fairmont, West

Virginia. The calls were received between the hours of 3:00 A.M. and 5:00 A.M. Officer Moran testified that the "1367 and 1369 Locust" apartments are the location of frequent law enforcement calls for "domestics, both verbal and physical" and "drug complaints." Officer Moran testified that "stabbings" have occurred at these locations as well as "parties" and described the area as a "high call volume area" that tends to have "a lot of drug activity and some more violent crime." (*See* FTR Gold at 10:02:45 – 10:03:19). Furthermore, the caller was known and could be located and could have been held responsible if the caller's allegations were fabricated. However, upon responding to the area, Officer Moran was able to sufficiently corroborate much of the activity the caller had described. Specifically, Officer Moran identified a red sedan as described by the caller located in the same area described by the caller. When Officer Moran initially arrived, the sedan was running, had the passenger window rolled down, and was playing music. However, nobody was initially present at the vehicle.

The caller further described individuals in two vehicles and noticed lighters coming on and off within the cars. This activity described by the caller in the Locust Avenue area given the lateness of the hour led Officer Moran to reasonably believe drug activity was likely occurring. Upon observing the area, Officer Moran noticed an individual go to the red sedan and leave. Officer Moran received a second call from dispatch in which the same known caller was complaining again of individuals in the red sedan playing loud music. It was clear that the caller was describing with particularity events they were viewing in real time as the vehicles were located outside of the caller's address. All of this taken together sufficiently corroborated and provided meaningful indicia of reliability to the caller's complaints.

Finally, upon arriving at the scene in response to the second call, Officers Moran and Buck observed a male walking away from the suspicious vehicle observed previously. When the Officers asked the man to stop, he continued walking, further raising their suspicions. As a result, under the totality of the circumstances, given the reliability of the tip, the investigation into the caller's

complaint regarding noise violations, the lateness of the hour, the suspicious activity observed by both the caller and Officer Moran, and the area's known propensity for drug activity and violent crime, upon arriving at the scene pursuant to the second call, reasonable, articulable suspicion that criminal activity was afoot existed. Therefore, Officers Moran and Buck were justified in conducting an investigatory stop of the Defendant who was seen walking away from the red sedan.

   B. **Officers Moran and Buck had reasonable, articulable suspicion that Defendant may be armed and dangerous sufficient to justify a protective pat down for officer safety.**

When an "investigatory stop is justified by reasonable suspicion, a subsequent frisk of a suspect for weapons is not necessarily permissible." Foster, 824 F.3d at 89 (citing United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (explaining "that an officer must have justification for a frisk or a 'pat down' beyond the mere justification for the traffic stop"). Rather, a "frisk must be supported by 'reasonable, articulable suspicion that the [suspect] is armed and dangerous.'" Foster, 824 F.3d at 89 (quoting Untied States v. George, 732 F.3d 296, 299 (4th Cir. 2013) (quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009); *see also* Terry, 392 U.S. at 24)). In assessing reasonable suspicion that an individual is armed and dangerous, many of the same factors discussed above for reasonable suspicion of criminal activity are permissible considerations. Further, an individual's "criminal history" and prior interactions with law enforcement are "probative of whether" an individual may be "armed and dangerous." United States v. Davis, 742 Fed.Appx. 714, 716 (4th Cir. 2018) (citing United States v. Holmes, 376 F.3d 270, 278 (4th Cir. 2004).

Here, the Defendant Oneil South and his criminal history were well known to law enforcement in Fairmont, West Virginia. The Defendant was known to have been the subject of multiple calls for service including domestic disputes, drug violations, and illegal possession of firearms. (*See* ECF No. 34-1-4, exhibits of Fairmont Police Dept. reports of encounters with Defendant involving firearms and illegal drugs). Officer Moran himself had previously encountered and investigated the Defendant for the illegal possession of firearms on September 25, 2016. (ECF

14

No. 34 at 7; *see also* ECF No. 34-1 at 1). Upon approaching the Defendant on the night in question, March 8, 2019, Officer Moran immediately recognized him to be Oneil South. Accordingly, given the lateness of the hour, the suspicion of drug activity, the location of the Defendant in an area of Fairmont known for drug activity and more violent crime, and the Officers' prior encounters with the Defendant specifically involving the illegal possession of firearms, Officers Moran and Buck had a reasonable, articulable suspicion that the Defendant may be armed and dangerous and were justified in conducting a protective pat down of the Defendant for officer safety.

## V. RECOMMENDATION

Accordingly, the undersigned **RECOMMENDS** Defendant's Motions to Suppress (ECF No. 30 and 32) be **DENIED**.

Any party shall, within eleven (11) (calendar) days[4] after being served with a copy of this Report and Recommendation, **on or before Monday, December 30, 2019**, file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should also be submitted to the Honorable Thomas S. Kleeh, United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir.

---

[4] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. McDaniel, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also United States v. Cunningham, 2011 WL 4808176, at Footnote 1 (N.D. W. Va., Oct. 6, 2011) and United States v. Mason, 2011 WL 128566, at Footnote 7 (N.D. W.Va., Jan. 7, 2011). In this case, the final pretrial conference is set before the Honorable District Judge Thomas S. Kleeh on January 6, 2020 and Jury Selection and Trial is set for January 28, 2020. The resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation from fourteen (14) days to eleven (11) days.

1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to any parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on Thursday, December 19, 2019.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE